**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **PIREN TECHNOLOGY CORPORATION** *Plaintiff,* | § § § | |
| **v.** | § § | **CASE NO. 3:22-cv-02256-D** |
| **MAD ENERGY LIMITED PARTNERSHIP f/k/a MAKE A DIFFERENCE VENTURES II, LIMITED PARTNERSHIP** *Defendant* | § § § § § § § | |

**MAD ENERGY, L.P.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

COMES NOW, Defendant, MAD Energy Limited Partnership f/k/a Make a Difference Ventures II, Limited Partnership ("MAD Energy") by and through his undersigned attorneys, hereby files its Answer, Affirmative Defenses, and Counterclaims.

ANSWER

1. It is admitted that MAD Energy signed a contract with Piren. It is denied that the contract obligated MAD Energy to pay Piren because Piren failed to meet the milestones for payment set forth therein. Further answering, MAD Energy funded each development milestone in advance – i.e., $2.8 million to reach the first milestone, and $4 million to reach the second milestone. MAD Energy properly terminated the agreement which terminates its obligation to fund development of future milestones. All other allegations of this paragraph are denied.

2. Denied.

3. Denied because Piren did not meet the milestones for payment. Piren induced

MAD Energy to pay $7 million in license fees based on claims of the existence of technology that it knew, or should have known, did not exist or could not be developed as promised into a commercially viable software product for MAD Energy's use. MAD Energy funded each milestone for the software's development in advance. MAD Energy properly terminated the agreement which terminates its obligation to fund development of the software towards future milestones.

4. Denied. Piren did not meet the milestones for payment. Piren induced MAD Energy to pay $7 million in license fees based on claims of the existence of technology that it knew, or should have known, did not exist or could not be developed as promised into a commercially viable software product for MAD Energy's use. MAD Energy funded each milestone for the software's development in advance. MAD Energy properly terminated the agreement which terminates its obligation to fund development of the software towards future milestones.

5. Denied.

6. This paragraph calls for a legal conclusion and does not require an answer. To the extent an answer is required, the allegations are denied.

7. Admitted.

8. Admitted.

9. Admitted.

10. Admitted.

11. Admitted.

12. Admitted.

13. It is admitted that Piren claims to have developed technology it calls TEL. It is

denied that Piren has actually developed commercially viable code that can be of commercial utility and value to MAD Energy as promised by Piren.

14. Denied as written. MAD Energy entered into a contract with Piren that obligated Piren to develop and then demonstrate development of its claimed technology into software specifically for MAD Energy's use. Had Piren met those milestones, MAD Energy would have been obligated to pay Piren a total of $25 million. In consideration of that sum MAD Energy would have obtained a license to the TEL software product that was commercially viable for MAD Energy to sub-license at a profit on the open market.

15. Denied as written. MAD Energy made $5 million in payments to Piren under licensing agreements that were superseded by the First Amended and Restated TEL Technology License Agreement ("Amended Agreement"). Based on Piren's claims of advancement in the commercialization of the TEL software for MAD Energy's specific use, MAD Energy paid an additional $2 million in license fees to Piren with the execution of the Amended Agreement in May 2022 to fund advancement of the software to the next milestone.

16. Denied.

17. Denied. Piren has not shown development of the TEL software in accordance with its plans or promises and has not used the funds paid by MAD Energy to hire the 17 critical staff necessary to meet the agreed upon milestones. Moreover, Piren intentionally withheld critical information regarding barriers to completion that preclude commercialization on the timeframe promised by Piren. Piren was aware that these timelines were critical to MAD Energy's agreement to license the TEL software.

18. Denied. The Amended Agreement speaks for itself. "Development Milestones" is defined by the agreement as "the development and commercialization milestones" and only

requires payment to fund further development if Piren actually meets specific milestones of development of software for MAD Energy's intended commercial use. MAD Energy terminated the agreement according to its terms.

19. Denied as written. MAD Energy made $5 million in payments to Piren under licensing agreements that were superseded by the Amended Agreement. Based on Piren's untruthful claims of advancement in the commercialization of the TEL software specifically for MAD Energy's commercial use, MAD Energy paid an additional $2 million in license fees to Piren with the execution of the Amended Agreement in May 2022 to fund development of the software towards the next milestone.

20. Denied.

21. Denied.

22. Denied as written. MAD Energy terminated the agreement according to its terms by notice tendered on September 26, 2022.

23. Denied as written. MAD Energy terminated the agreement by notice on September 26, 2022, which provides 60-days of notice of the effective date of termination.

24. It is admitted the MAD Energy's notice of termination made clear that no further payments or services would be forthcoming from MAD Energy to Piren to fund development of the promised software to the next milestone. The remaining allegations are denied.

25. Denied as written. MAD Energy is not obligated to make any further payments to Piren. MAD Energy paid $7 million to Piren for software development that did not actually occur. MAD Energy is entitled to the return of the $7 million paid to Piren for a license for technology that Piren claimed it had created and was developing for MAD Energy's specific needs. The agreement lacked consideration as MAD Energy did not actually receive anything in return for

its $7 million payments.

26. Denied.

27. Denied.

28. The above and foregoing answers are incorporated here as if restated in full.

29. Admitted.

30. Denied as written. The parties entered into multiple agreements.

31. Denied.

32. Denied. Piren did not meet the milestones for payment. Piren induced MAD Energy to pay $7 million in license fees based on claims of the existence of technology that it knew, or should have known, did not exist or could not be developed as promised into a commercially viable software product for MAD Energy's use. The agreement lacked consideration. MAD Energy funded each milestone for the software's development in advance. MAD Energy properly terminated the agreement which terminates its obligation to fund development of the software towards any future milestones. Piren is not entitled to any further payments.

33. Denied.

34. Denied. Piren is not entitled to attorney's fees as it cannot prevail on its meritless claims.

35. Denied.

36. Admitted.

## AFFIRMATIVE DEFENSES

1. Piren is estopped from pursing its claims against MAD Energy based on the doctrine of unclean hands. Piren has not acted fairly and without misrepresentation in its

relationship with MAD Energy.

2. Piren's claims fail for its failure to perform under the contracts the subject of this suit.

3. In the alternative, Piren's claims against MAD Energy fail as the agreement between them fails for a lack of consideration. A failure of consideration occurring after a contract's inception constitutes a defense to an action on the written agreement and is ground for cancellation or recission of the contract. Piren induced MAD Energy to pay millions of dollars in license fees based on the assurance of technology that was capable of development into a product capable of commercialization. Piren never actually had such technology and withheld critical information regarding the development process and technological barriers that rendered the promised product impossible in the timeframe promised.

## COUNTERCLAIMS

Now, in the posture of Counter-Plaintiff, comes MAD Energy, L.P. ("MAD Energy"), and sues Counter-Defendant Piren Technology Corporation ("Piren"), as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Piren Technology Corporation, Counter-Defendant, has submitted itself to the jurisdiction and venue of this Court by its Original Complaint.

2. MAD Energy, L.P., Counter-Plaintiff, submits itself to the jurisdiction of the Court herein.

## FACTS COMMON TO ALL COUNTS

3. In 2017, a California corporation NBOR, Inc. granted Pyren Technology Corporation (predecessor of Piren) a world-wide exclusive license for NBOR's intellectual property, patents, and licensed property including and related to specific computer programing

code it would collectively describe as TEL Technology.[1]

4. Piren did not license or create any patented technology beyond that obtained from NBOR, Inc., in 2017 throughout its relationship with MAD Energy through September 2022.

5. On April 13, 2021, Piren (via its predecessor) entered into a Letter of Intent ("LOI") with MAD Energy (via its predecessor) for a six-month exclusivity period in which to obtain an "exclusive global license in the industrial control field of use" for the TEL technology Piren claimed it had already developed to a point that would allow for the specific development of software for MAD Energy's commercial use.

6. Piren claimed that as of that time, it had already developed that certain software that MAD Energy sought to license, and would further develop that software for MAD Energy's use, stating: "WHEREAS, Licensor has developed certain software for which Licensee desires to obtain an exclusive global license in the industrial control field of use (the "License")…"

7. Piren further declared that it had already developed the TEL Technology, declaring: "WHEREAS, the technology known as TEL Technology was developed in research conducted by Licensor…"

8. MAD Energy paid Piren $200,000 for this exclusivity period to negotiate a license for the software pursuant to the LOI.

9. Piren had not actually developed the TEL software to the level claimed. It had conceptual code but no actual software, contrary to its oral and contractual assertions to MAD Energy. Piren used the claimed need for complete confidentiality to prohibit MAD Energy from having transparent access to the state of development.

10. MAD Energy relied on Piren's representations.

[11] NBOR, Inc. and Piren both have the same principal owner and chairman Dennis Jaeger.

11. The LOI further detailed that the parties intended that Piren would obtain from MAD Energy a $25 million licensing fee payment upon meeting all milestones of software development, in addition to a royalty of 15% of all future sub-license fees generated by MAD Energy from the TEL software used in the industrial control field of use. The LOI made clear the parties intended that a software product ready for commercial use and licensing would be provided to MAD Energy in exchange for the $25 million license fee and 15% royalty.

12. In September 2021 MAD Energy and Piren executed the TEL Technology License Agreement (the "Original Agreement").

13. The Original Agreement stated that Piren had already developed TEL Technology, which was a software system that was being further developed specifically for MAD Energy's commercial needs.

14. Specifically, the Original Agreement granted a license to MAD Energy for the "utilization of TEL software with a Zenneck surface wave for exploitation of TEL software in the Power Field of Use."

15. In lay terms, MAD Energy purchased the right to use the TEL software Piren would develop for MAD Energy in industrial power control devices necessary for the regulation and metering of wireless energy transmission via what is known in the industry as "Zenneck surface wave principles." This Zenneck wave principal is akin to the famous works of Nikola Tesla, including the Wardenclyffe Tower that transmitted wireless power to the village of Shoreham, New York in the early 1900's.

16. The Original Agreement contains detailed provisions of the royalty payments due to Piren once MAD Energy started to sub-license the TEL software for the "Power Field of Use."

17. MAD Energy paid $2,800,000 when the Original Agreement was executed.

18. This $2.8 million in payments was specifically intended to fund Piren's further development of the software towards commercialization for MAD Energy's use as measured by the milestones in the Original Agreement. Within six months of the execution of the contract Piren was obligated to use the $2.8 million paid at execution of the Original Agreement to provide a detailed conceptual design of the TEL software that had materially advanced during that period.

19. This milestone was intended to show development towards software MAD Energy could commercialize in the Power Field of Use. Piren claimed to have met this milestone. Piren did not actually meet this milestone as the conceptual design was not actually materially advanced during the six-month period. Had MAD Energy been informed that the conceptual design had not actually been materially advanced, it would not have funded development towards the next milestone.

20. Approximately eight (8) months after the Original Agreement, on May 13, 2022, MAD Energy made an additional payment of $2 million to Piren based on Piren's assertion that it had belatedly met the milestone to demonstrate a detailed conceptual design.

21. On May 27, 2022, Piren and MAD Energy executed the First Amended and Restated TEL Technology License Agreement ("Amended Agreement"). On this date MAD Energy made another $2 million payment based on Piren's "Notice of Milestone Completion."

22. Piren insisted that the "Licensor Development Milestones" of the Amended Agreement be changed from the wording of the Original Agreement. In particular, the Original Agreement's second milestone requiring "TEL Architecture in detail with key software team in place" was changed to only require "TEL Architecture in development with key software people on team."

23. The change from a "detailed" architecture to an undefined "in development"

architecture was a material change that drastically lowered the value of the Milestone. Piren had allegedly been "in development" of the TEL software architecture since it acquired the technology rights from NBOR in 2017; long before it first communicated with MAD Energy. MAD Energy was not compensated for this material change in the consideration provided for in the Original Agreement as compared to the Amended Agreement.

24. Similarly, the milestone change from "key software team in place" to "key software people on team" rendered the milestone so nebulous that Piren could claim achievement without actually advancing the licensed product in any meaningful way.

25. The "key software team" language was tied directly to the business plan Piren shared with MAD Energy. The business plan showed a software team with 17 critical members in year one, consisting of:

- One (1) Executive Assistant to the Chief Designer,
- One (1) Chief Technology Officer,
- Two (2) Software Managers,
- One (1) Architect UX,
- Two (2) Developers UX,
- Three (3) Consulting, IT and Security staff members,
- Two (2) Core Architects,
- One (1) Lead Core Developer,
- Three (3) Core Developers, and
- One (1) Quality Assistance Code Manager,

26. As of the termination of the Amended Agreement by MAD Energy, Piren had hired just three (3) of these 17 "key software people" and the majority worked remotely from

outside the United States, evidencing its inability or unwillingness to develop the software as agreed.

27. Piren also directed that the final Licensor Development Milestone of the Amended Agreement be changed from the Original Agreement's wording. The last milestone in the Original Agreement required Piren to show: "TEL alpha code demonstrates alpha-level capability of TEL technology." It was changed at Piren's insistence to only require, "Components of software developments demonstrate key aspects of TEL technology."

28. Alpha-level capability means the software is ready for real-world user testing. "Alpha Testing is a type of software testing performed to identify bugs before releasing the product to real users or to the public. Alpha Testing is one of the user acceptance tests."

29. Demonstrating that "key aspects" of the software function is far short of declaring that the product has been Alpha-tested and is ready for a real-world environment. Piren convinced MAD Energy that it had key aspects of the software already functioning at the start of their relationship. This change functionally eliminated all assurance of quality and useability in the final TEL product MAD Energy was purchasing for $25 million.

30. MAD Energy was induced to accept these changes based on the specific assurance of Piren, that development of the software for MAD Energy's commercial use was on schedule and that these changes did not reflect a deviation in the development plan or timing.

31. As of May 27, 2022, MAD Energy had paid Piren $7 million to license TEL software that Piren was allegedly developing for its commercial use. Piren indicated it was using those funds to develop the software MAD Energy agreed to license.

32. Piren assured MAD Energy that the software would be commercially viable within 36 to 38 months. Piren further promised to use the MAD Energy payments to hire 17 critical staff

members.

33. MAD Energy relied on Piren's representations.

34. After making $7 million in payments, MAD Energy became aware that Piren withheld critical information about the viability of its TEL software for MAD Energy's commercial use. Piren failed to inform MAD Energy that it had become aware that its development plans did not account for a software module that would take approximately four (4) years on its own to create (from mid-2022), despite promising an at-worst 38-month completion target from the Original Agreement date in September of 2021. This fact rendered the TEL software license worthless for MAD Energy's purposes. Piren, and its principal, Dennis Jaeger specifically, withheld this information from MAD Energy to induce additional payments.

35. Piren also failed to disclose that it had not used the $7 million already paid by MAD Energy to hire the critical software programing staff members it said it needed to create the TEL software for MAD Energy's commercial use. Instead, Piren had only hired three "Software Architect and Development Directors," one marketing associate and Jaeger's stepdaughter, despite her lack of qualifications.

36. Beginning in mid-2022 Piren excluded its Chief Marketing Officer, Jeff Kopang, from important technical development and progress information. This was a critical change as Kopang was the Chief Marketing Officer in charge of the business side of Piren, and the liaison with MAD Energy. Dennis Jaeger refused to give MAD Energy access to the technology to confirm development and Kopang was responsible for making sure the technology was commercially viable.

37. Piren dramatically and suddenly restricted Kopang's access and ability to keep MAD Energy informed of the commercial development of the software which shrouded the

progress in darkness. This was never contemplated by the parties when the Original and Amended Agreements were executed.

38. Piren knew by at least August of 2022 that the software it was charging $25 million to Mad Energy to create and license would not be developed on time. Piren failed to disclose this material information to Mad Energy in bad faith.

39. Piren further knew prior to entering into the Original Agreement with MAD Energy that the $25 million license would not provide MAD Energy with a commercially viable software product.

40. As stated in the Original and Amended Agreements, Piren indicated its software would run on existing cloud-based "commercial non-managed network[s]." Piren did not inform MAD Energy that any user of the TEL software developed for MAD Energy would be required to build a new physical hardware infrastructure that did not exist. In order for the TEL software to function as promised for MAD Energy's intended use, any user would require multiple large data centers with multiple supercomputers at each location, and high-speed volatile access memory at sizes and speeds that do not even exist in the market today.

41. In sum, had Piren built the software it promised, MAD Energy would not have been able to sub-license the product as there would be no infrastructure to support its operation. This fact was known to Dennis Jaeger and Piren but withheld from MAD Energy in order to induce the purchase of a useless $25 million license. Had Jaeger and Piren told MAD Energy the truth, MAD Energy never would have agreed to fund the development and license the TEL software.

42. Piren has not fully architected the TEL software system for MAD Energy's use. And still to this date, no proof of a successful architecture, or even an architecture "in

development" has been offered to MAD Energy.

43. Piren did not make any substantial efforts to scale up its TEL software (to the extent it even existed) to meet the licensed capability that MAD Energy had paid to obtain during their contractual relationship. The software code as of September 2022 was materially the same as it was a year earlier in September 2021. MAD Energy had paid $7 million for development but no material development occurred and Piren was not making serious efforts to change that status. The only material change was that Piren acquired $7 million of MAD Energy's money.

44. Once aware of Piren's failure to actually advance the TEL software towards a product MAD Energy could license for use in the real world, MAD Energy terminated the Amended Agreement pursuant to its terms and refused to fund further development.

45. Paragraph 4.1 of the Amended Agreement makes clear that payments are due to Piren "if and only if" it meets the "Development Milestones set forth" in the agreement.

46. Paragraph 9.2.1 expressly states that MAD Energy may terminate the agreement with sixty (60) days' notice.

47. Paragraph 9.2.1 further makes explicit that upon termination without cause, MAD Energy "shall forfeit all payments made to [Piren] under Exhibit 1 as of the date of Termination." MAD Energy does not owe Piren any additional amount pursuant to its termination of the Amended Agreement.

48. The Amended Agreement limits the liability of either party to the value of License Issuance Fees paid in the preceding twelve months, at paragraph 7.5. Piren filed suit on October 6, 2022. In the prior 12 months – i.e., since October 6, 2021 – the total License Issuance Fees paid equals $4 million, as paid on May 13 and 27, 2022.

49. MAD Energy seeks the return of this $4 million amount in addition to the $3

million paid to Piren before the Amended Agreement based on the lack of consideration for the formation of the Original and Amended Agreements.

COUNT ONE – RESCISSION OF THE CONTRACT

50. The above and foregoing are asserted here as if repeated in full.

51. The TEL software product MAD Energy licensed from Piren was never going to be commercially viable. Therefore, MAD Energy was never going to receive consideration for the $25 million it agreed to pay upon completion of the contractual terms.

52. The TEL software product MAD Energy licensed from Piren was not developed for MAD Energy's use according to the terms of the Original Agreement (TEL Technology License Agreement) or the Amended Agreement (First Amended and Restated TEL Technology License Agreement). MAD Energy paid Piren $7 million in licensing fees but received no consideration in return for meeting its contractual obligations.

53. The Original Agreement and the Amended Agreement fail for lack of consideration.

54. The Original Agreement and the Amended Agreement must be rescinded.

55. The parties must be put back into the position they were in prior to the contracts.

56. MAD Energy must return what it has obtained from Piren, which is nothing.

57. Piren must return the $7 million in payments it obtained from MAD Energy.

58. A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage.

59. Piren was enriched by taking undue advantage of MAD Energy. Piren obtained $7 million it claimed was earmarked for development of the TEL technology into a software product for MAD Energy's commercial use. Piren did not use the majority of the funds to develop a

software product MAD Energy could use. This was a direct benefit of Piren taking undue advantage of MAD Energy.

60. MAD Energy is entitled to the return of the $7 million it paid Piren without obtaining a corresponding benefit.

COUNT TWO – BREACH OF CONTRACT (in the alternative to Count One)

61. The above and foregoing are asserted here as if repeated in full.

62. If, in the alternative to Count One, Piren and MAD Energy had a valid and enforceable contract, then Piren breached the contract.

63. Piren was paid to develop its existing technology to meet the needs of MAD Energy.

64. Piren did not provide material development of its TEL software for MAD Energy's commercial use in accordance with the terms of the Original or Amended Agreements.

65. Piren did not act in good faith, or deal with MAD Energy fairly by failing to share the true status of the TEL technology before the Original Agreement or the real timeline to development of a commercially viable software product for MAD Energy.

66. Piren did not actually meet the milestones of the Original or Amended Agreements but represented to MAD Energy that it had.

67. Piren induced MAD Energy to make milestone payments in breach of the applicable contract terms.

68. MAD Energy performed according to the terms of the Original and Amended Agreements by making $7 million in license fee payments.

69. Piren did not provide the services and resulting tangible programing software it was contractually obligated to provide under the express terms of the agreements.

70. Pursuant to the terms of the Amended Agreement, in the case of breach by Piren, MAD Energy's damages are capped at the $4 million paid to Piren in the preceding twelve-month period.

71. MAD Energy seeks $4 million in breach of contract damages from Piren.

PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, MAD Energy, L.P. respectfully requests the Court order the following:

1. Enter a take-nothing judgment against all of Piren's claims in favor of MAD Energy;
2. Award a judgment rescinding the Agreements entered into by the Parties as further described herein, and return the Parties to their original positions by awarding the return of $7 million in payments made by MAD Energy pursuant to the Agreements;
3. In the alternative, enter a judgment against Piren in favor of MAD Energy for breach of contract in the amount of $4 million;
4. Prejudgment and post judgment interest to the maximum allowable rate by law;
5. Reasonable and necessary attorneys' fee and costs; and,
6. Any further relief to which MAD Energy may be entitled in either law or equity.

Dated: November 2, 2022

Respectfully submitted,

**THE HUNNICUTT LAW GROUP**

*/s/ Tim Robinson*
J. Stephen Hunnicutt-Lead Attorney
State Bar of Texas No. 10279510
Steve@Hunnicuttlaw.com
Timothy A. Robinson
State Bar of Texas No. 24069040
Illinois ARDC No. 6324565
Tim@Hunnicuttlaw.com
17330 Preston Road, Suite 275-B
Dallas, Texas 75252
(214) 361-6740 Phone
(214) 691-5099 Fax

DAVILLIER LAW GROUP, LLC
Daniel E. Davillier (Louisiana No. 23022)
(*pro hac vice* forthcoming)
ddavillier@davillierlawgroup.com
Charles F. Zimmer II (Louisiana No. 26759)
(*pro hac vice* forthcoming)
czimmer@davillierlawgroup.com
935 Gravier Street, Suite 1702
New Orleans, LA 70112
Phone: (504) 582-6998
Fax: (504) 582-6985

***Attorneys for Defendant***

## CERTIFICATE OF SERVICE

I certify that on November 16, 2022, a copy of the foregoing pleading were served via ECF to all counsel of record.

*/s/ Tim Robinson*
Timothy A. Robinson